# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF OKLAHOMA

GLORY RACHELLE WOOLLEY, individually;

    Plaintiff,

v.

CHRIS ELLIOTT, individually, and in his official capacity; DANNY ELLIOTT, individually, ELIZABETH CROCKETT, individually,  and
MEAGAN SINCLAIR, individually;

    Defendants.

Case No. CV-2021- 069-RAW

## **COMPLAINT**

COMES NOW, the Plaintiff, Glory Rachelle Woolley (Plaintiff), individually, and hereby submits her Complaint in the above matter. In support thereof, Plaintiff alleges and states as follows:

1. This matter arises from the tragic death of Plaintiff's nephew, E.C.W. A tragedy that was made worse by Defendants who conspired to falsely prosecute Plaintiff's parents, remove Plaintiff from her home and fabricate evidence. Obviously, Defendants' actions had dire consequences for Plaintiff.

2. Defendants conspired to fabricate evidence and removed Plaintiff from her home and interfered with her familial relationship and association.

3. This is a civil rights action under 42 U.S.C. § 1983.

4. Jurisdiction is proper pursuant to 28 U.S.C. § 1331 in that Plaintiff has alleged a federal question and this Court has supplemental jurisdiction over

1

the state claims under 28 U.S.C. § 1367 because such claims arise out of the same set of facts and circumstances. Moreover, venue is proper with this Court because a significant portion of the acts alleged herein occurred within the territorial limits of this District.

5. That Defendant Chris Elliott (Sheriff Elliott) is currently the Wagoner County Sheriff and was employed as the Wagoner County Sheriff in June of 2018. Under 19 O.S. § 161 Chris Elliott is a "County Officer."

6. Defendant Danny Elliott (Detective Elliott) is an Investigator for Wagoner County Sheriff's Department (WCSD).

7. Elizabeth Crockett (Crockett) is a Deputy for the WCSD.

8. Meagan Sinclair (Sinclair) is a SANE nurse who at the direction of Detective Elliott provided a false report regarding Bill Woolley and Lisa Woolley (the Woolleys), the parents of Plaintiff.

9. On March 30, 2018 E.C.W. was found dead in his crib. E.C.W. resided in the same residence as Plaintiff, with the Woolleys. E.C.W. was 14 months at the time of his death.

10. The Woolleys had guardianship of E.C.W. and are the maternal grandparents of E.C.W. and C.W. C.W. is the brother of E.C.W.

11. Detective Elliott arrived at the Woolley residence as the purported lead investigator. The problem for the Woolley family was that their nightmare was about to get a whole lot worse.

6:21-cv-00069-SLP   Document 2   Filed in ED/OK on 03/01/21   Page 3 of 18

12. In addition to the horrific death of E.C.W., Detective Elliott was already convinced that a murder occurred. On his way to the Woolley residence, Detective Elliott had already told a supervisor that he was going to a murder scene. E.C.W. did indeed die of (SIDS), but Detective Elliott, despite having no medical experience, purports to believe that SIDS does not ever exist. Detective Elliott has repeatedly espoused this falsehood in his malicious crusade to destroy the Woolley family.

13. On March 30, 2017, Plaintiff was still a minor and turned eighteen on April 18, 2018 a mere weeks later.

14. On March 31, 2018 Wagoner County detectives and DHS removed Plaintiff from her parents' custody and home, two weeks before her 18th birthday. A search of the residence occurred and no physical evidence or DNA was found and much exculpatory evidence was intentionally left behind by Detective Elliott.

15. That Plaintiff was removed from her parents' custody. This resulted in having her parents miss her high school graduation; she was in the top 5% of her class and she graduated with honors. After she graduated high school, her familial relationship continued to be damaged by Defendants when her parents were incarcerated over the holidays, she could only visit her parents at the Wagoner County Jail. Plaintiff's parents also missed Plaintiff winning the State rugby championship with Plaintiff as the captain. Plaintiff's parents also missed her prom and a scheduled graduation family trip.

3

16. On April 12, 2018 the Woolleys were arrested for false allegations of sexual assault and enabling sexual assault. They spent four months in jail. After the preliminary hearing on July 31, 2018, the Woolleys bond was reduced and they bonded out.

17. The Woolleys were arrested a second time on December 20, 2018 for First Degree Murder and Sexual Assault of a child, the Woolleys were denied bail until March 30, 2019 wherein bond was reduced to $12,500.00. Before this bond reduction, Bill Woolley had been denied bond and Lisa Woolley's was half a million.

18. On June 15, 2020, the First-Degree Murder and all Sexual Assault charges were dropped.

19. That as evidence of the conspiracy and Detective Elliott's malfeasance, a law enforcement officer is quoted as saying "Danny had his mind made up before he got there. He didn't even want to get a search warrant."

20. As part of his plot to destroy Plaintiff's parents, Danny Elliott later testified that he was an expert on SIDS, that he had taken a two weeklong seminar on investigating child deaths. This was a gross distortion and a misstatement of the purported seminar. Detective Elliott intentionally, falsely and maliciously developed the opinion that SIDS was not real, notwithstanding the overwhelming medical evidence and research to the contrary. Such was not Detective Elliott's opinion, but merely false testimony designed to imprison the Woolleys.

21. That the belief that SIDS does not exist and the bias that a murder occurred is apparently shared by Sheriff Chris Elliott (no relation). Sheriff Elliott told the media in an interview in August of 2018 that:

> "14-month-old babies just don't die … there's a reason why they die." "We're operating under the pretenses right now that somebody inside that home murdered that child," "Identify who's responsible inside that house for ending that child's life."

22. Thus, in order to satisfy his boss and his own agenda Danny Elliott needed to charge someone-the Woolleys-with murder.

23. After the body of E.C.W. was taken to the ME, his five-year-old brother, C.E., was whisked away at the behest of Danny Elliott to Kids Space in Muskogee, Oklahoma for a Sexual Abuse Nurse Examine (SANE), despite there never being a disclosure of any sort for the necessity of a SANE exam. C.W. was taken to the exam by Crockett and she, at the direction of Danny Elliott, falsely stated that she overheard the SANE exam, from outside the room with the door closed.

24. The SANE exam was performed by Sinclair. By this time C.W. already had two interviews, with one being a first forensic interview that was recorded which did not implicate the Woolleys. Sinclair, in conspiracy with Defendants, falsely reported to have uncovered rape and child molestation. Sinclair reported that C.W. claimed that E.C.W. was raped daily while sitting on the couch with the grandfather (Bill Woolley) watching TV, in the open living room, in the presence of others. With grandmother sitting nearby doing nothing, while E.C.W. screamed and cried and was spanked as punishment. These false

5

statements by Sinclair were in the specific direction of and in conspiracy with Danny Elliott.

25. As a result of this interview and solely on the basis of this false information, the Woolleys were charged with initially sexual assault and enabling sexual assault based solely on the false report of Sinclair.

26. Four days later, obviously because evidence was lacking, the Wagoner County District Attorney's Office ordered a second forensic interview with C.W. This forensic interview was recorded and did not implicate the Woolleys. Moreover, C.W. denied telling Sinclair anything incriminating when pressed by the interviewer with leading questions. This interview was withheld from the Woolleys until March of 2019. In fact, the district attorney's office denied the existence of the second forensic interview when it was cross-referenced in documents. Specifically, the-Assistant District Attorney, Michelle Keely, explicitly stated to the Woolleys' attorneys that reference to the second forensic interview was a mistake and no second forensic interview occurred. Other incredulous statements that Sinclair attributed to C.W. included that C.W. referred to his grandpa as William, including Sinclair writing down that the abuser was named "William" and that C.W. told her so. C.W. had no knowledge that his formal name was William. Moreover, C.W. is developmentally delayed and would be unable to articulate the abuse in the manner alleged by Sinclair. Moreover, Defendants are aware that recently C.W., in yet another interview, asked to go home with the Woolleys and the foster parent stated "no you don't

want to go back to him, remember all the bad things he did to you," to which C.W. replied "No." Moreover, C.W. is developmentally delayed, especially in speech and it is impossible to articulate the alleged abuse in the manner attributed by Sinclair, Detective Elliott and Crockett.

27. The false allegations of Sinclair allowed the Wagoner County District Attorney's Office to falsely charge the Woolleys.

28. Sinclair quoted C.W. with giving elaborate answers yet the interviews that were recorded shows C.W. with rushed and jumbled words. The transcript shows that the forensic interviewers struggled to comprehend what C.W. was saying and had to stop several times. Yet Sinclair was so certain she wrote out verbatim accusations from C.W. that were concise and detailed, testifying that she wrote exactly what C.W. told her. Further, Sinclair's intentional, false and misleading conduct is exemplified by her testifying in court that C.W. had no speech impediment. This confirms that no SANE exam occurred and that the statements attributed to C.W. are made up.

29. The Assistant District Attorney, Marny Hill, is engaged in a conspiracy with Defendants. First, Hill has previously expressed the written opinion that prosecutors should protect law enforcement. This was in reference to another police officer who was found by a federal court to be *Giglio*-impaired. Nevertheless, Hill thought that this police officer should be protected because it was the prosecutor's job to protect law enforcement. Apparently, Hill still believes it is a prosecutor's job to protect law enforcement. The Wagoner County

District Attorney's Office assisted Defendants in their misconduct by cover-up and withholding documents and evidence and by falsely and intentionally misstating facts.

30. On February 26, 2020 Hill sent a threatening letter to the Woolleys criminal attorneys complaining about publicity in blogs regarding the case. Ironically, neither Hill nor anyone from the Wagoner County District Attorney's Office was bothered by statements made by Sheriff Elliott. Hill threatened to revoke the Woolleys' bond and threatened new criminal charges.

31. On the February 25, 2019 Danny Elliott was admonished by Judge Shook for posting on Facebook about a pending case during the trial.  Ironically, it was a sexual abuse trial. Elliott posted "when your ego, thirst to show how powerful you are, or just good old-fashioned greed overshadows protecting children from sexual predators you are simply evil." Further, Danny Elliott posted that he is "[r]equesting prayers that justice prevails from evil this week . Pray for the truth to shine a light from the darkness so all can see." Apparently, the State did not  share the concern for "poisoning the jury" with Danny Elliott. Danny Elliott was found by the Judge  to be untruthful when Danny Elliott tried to say it was in reference to an out of state case and the Judge said, "quite frankly I do not believe you." This finding by the Judge regarding Danny Elliott's truthfulness was required to be turned over to the Woolleys as *Giglio* and to this day the information has not been disclosed. The State cannot take the position that it is unaware of this evidence as ADA Bennett was present for the state and he was

8

one of the prosecutors herein in the Woolley's case.

32. That C.W. was interviewed on March 30, 2018 by DHS in the presence of the school counselor and Detective Elliot. This interview took place before C.W. was corrupted by Danny Elliott, Crockett and Sinclair. C.W. did not yet know that his brother had died. During this interview C.W. stated that he would tell his teacher if anything bad was happening to him at home. He said his Papa, grandma and Plaintiff would keep him safe at home when asked who keeps him safe at home. When asked if he ever gets hurt at home, C.W. answered, "No." C.W. stated when asked if he feels safe with the Woolleys and Plaintiff answered "yes." Worker asked Clayton if there are more happy faces or sad faces at home and C.W. answered, "Happy faces". C.W. also stated "nobody ever gets hurt at home."

33. The interview referenced in paragraph 33 was not produced to the Woolleys and was concealed by Defendants. It was only discovered within the last year. The Wagoner County District Attorney's Office intentionally did not produce it and conspired to withhold it. In fact, on March 6, 2019 after numerous requests, the records were finally received and any record of this interview was of course missing. On March 18, 2019, the report of this interview was turned over. Defendants were aware that the first interview was the most accurate as do the expert's in the field, yet this interview was concealed as was another interview discussed below.

34. On March 31, 2018 03/31/2018 at 1:45 pm an Affidavit for Search

9

Warrant issued and signed by Crockett. Crockett allegedly stood outside the door where the SANE exam was being conducted. Crockett's statement that she was outside the door listening is a false statement.

35. Prior to meeting Sinclair, C.W. gave a forensic interview (first forensic interview) (2nd interview). C.W. was asked if his papa or anyone else does anything to him when he is tucked in other than pray and turning on his fan, he answered "No." C.W. indicated a few times that he was tired and wanted to go home. The interviewer asked C.W. if anyone was ever mean to him E.C.W. and C.W. answered "Yes, me." C.W. indicates that sometimes he takes toys from E.C.W. At no time were the Woolleys implicated in the interview. This interview was recorded.

36. Almost immediately after this interview, C.W. has his 3rd interview, the SANE exam. Danny Elliott was unhappy that C.W. exonerated the Woolleys on the first two occasions, none of which was known or disclosed to the Wooleys at the time. Sinclair falsely states that C.W. made the disclosures to her. Of course, Sinclair did not record this interview. Detective Elliot was in both prior interviews that exonerated the Woolleys are was aware of the falsity of the statements attributed to C.W.

37. At 10:30 p.m., C.W. had yet another interview, (4th interview) and was interviewed by DHS and again did not implicate the Woolleys to DHS.

38. On April 4, 2018 Detective Jake Kelley of Wagoner Sheriff's Department is quoted as saying that he attended a second forensic interview

with C.W. at Kid's Space in Muskogee, OK. at the request of the Wagoner County DA's Office. Undoubtedly, the Wagoner County DA did not believe that the Woolleys could be charged. This interview was conducted by Maria Rosales Lambert as well as Wagoner County DHS.  Elliott was present at the interview. C.W. asked to leave several times, he denied that any inappropriate touching occurred and when prompted by a leading question by the interviewer.  In referring to C.W. SANE nurse interview a few days earlier, the Maria Rosales Lambert asks C.W., "How about, did you say something to the NURSE about E.C.W.'s privates, butt, or other body parts?" C.W. answered, "No." This interview was kept from the defense for 11.5 months and each time it was requested, attorneys were told repeatedly that no such interview existed. It was not produced until March of 2019. As further evidence of Detective Elliott's malice, he has acknowledged that Rosales Lambert was his "top child interviewer." Yet, he chose to ignore this interview and moreover concealed its existence in conspiracy with Keely and the Defendants.

39.   On June 15, 2020 all charges against the Woolleys were dismissed. As further evidence of the conspiracy, and malice of Defendants, charges against the Woolleys were re-filed to child neglect, allegedly for not keeping their adult daughter from using drugs while pregnant or obtaining prenatal care. But, the ADA Hill did not file similar charges against the biological father or the paternal grandparents.  The charges have subsequently been dismissed and refiled twice more in an attempt to get around obvious legal and substantive deficiencies.

Moreover, the Woolleys were targets of a multicounty grand jury (MCGJ) which did not indict the Woolleys. Nevertheless, the Wagoner County District Attorney's Office filed bogus charges after the grand jury did not indict the Woolleys.

40. Plaintiff, under fear of prosecution and intimidation by Detective Elliott and Jack Thorp agreed to testify at the grand jury in exchange for immunity. Specifically, Thorp told you that Detective Elliott was wanting to charge Plaintiff with a crime. Detective Elliott wanted Plaintiff to testify against the Woolleys and implied that she testify adversely by saying "we know what they did."

41. At one interview Plaintiff had with Detective Elliot, Plaintiff asked that she be read her rights based on the hostile nature of Detective Elliott, he terminated the interview. Elliot went to Plaintiff's college, went to the library to serve a subpoena on Plaintiff to testify before the 17th MCGJ. Detective Elliott smirked and told Plaintiff because since she would not talk to him previously she did not cooperate they would do it his way.

42. Plaintiff showed up at the MCGJ to testify and before testifying she met with Wagoner County DA Jack Thorpe, Thorpe tried to convince Plaintiff that her parents were guilty, but she refused to allow be manipulated by them. She also when told by Thorpe to review documents, told him she would review any documents except pictures of E.C.W. While walking to a conference room, Thorpe "accidentally" dropped pictures of E.C.W. on the floor for Plaintiff to see.

43. Defendants failed to intervene to a known unconstitutional conduct.

12

44.     That official and municipal liability exists based on the unlawful policy of Sheriff Elliott and his directive that 14-month babies just don't die. BCCCW is aware of such policy and has failed to take appropriate action. Further, Detective Elliott is not properly trained. Such conduct amounts to municipal and official liability because 1) the conduct created an informal custom amounting to a widespread practice that although not written or formally promulgated it has the force of law; 2) such decisions are those of employees with final policymaking authority, including Sheriff Elliott;  3) such conduct has been ratified by final policymakers, including Sheriff Chris Elliott and the BCCCW; and 4) the failure to adequately train or supervise employees or *de facto* employees.  The unconstitutional policy stated herein created the unlawful conduct upon Plaintiff.

45.     That Defendants have concealed numerous unlawful conduct and continue to do so. Further, Plaintiff did not discover the unlawful conduct of Defendants until the production of the intentionally withheld interview and discovery is still being stymied to include the withholding of exculpatory evidence and secreting of documents by defendants.

**COUNT  I-42 U.S.C. § 1983-4th AMENDMENT UNREASONABLE SEIZURE**

Plaintiff restates the above. Additionally, Plaintiff states:

46.     Defendants caused Plaintiff to be removed from the custody of her parents. The loss of her parents' companionship was made worse by Plaintiff grieving the loss of E.W and the removal of C.W. and in dire need of her parents.

47.     That the individual defendants affected an unlawful seizure by causing Plaintiff's removal through false statements of fact and reckless omissions.  Plaintiff suffered substantial damages as a result of the removal and Defendants conduct.

48.     That had the false statements of fact not been provided or the reckless omissions provided, no seizure would have occurred.

49.     That the conduct by all Defendants was under the color of law and were acting in conspiracy with state actors, including numerous employees of the Wagoner County District Attorneys' Office.  Plaintiff's due process rights were violated and she was the victim of an unlawful seizure under the 4th Amendment to the U.S. Constitution.

50.     As a result of Defendants' conduct, Plaintiff has sustained actual damages in excess of $75,000.00.

51.     Defendants have acted with reckless disregard for the rights of Plaintiff and as such punitive damages in excess of $10,000.00 should be assessed against them.

52.     Defendants should be ordered to reimburse Plaintiff a reasonable amount of attorney fees and costs incurred herein.

**COUNT II-42 U.S.C. § 1983 SUBSTANTIVE DUE PROCESS/Interference WITH FAMILIAL RELATIONSHIP**

Plaintiff restates and realleges the foregoing as though fully set forth herein.  Further, Plaintiff alleges:

53. Under the Fourteenth Amendment to the United States Constitution, parents and children have a protected liberty interest in the care, custody and control of their children. *Troxel v. Granville,* 530 U.S. 57, 65 (2000).

54. The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law."

55. That included within the Due Process Clause is a substantive component that "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Reno* v. *Flores,* 507 U. S. 292, 301-302 (1993).

56. State actors may not remove children from the home, through either temporary seizures or the permanent termination of parental rights, without providing due process of law. *Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982).

57. That the substantive due process right of familial association also protects the adult relationship among Plaintiff and her parents.

58. As a result of Defendants' conduct, Plaintiff has sustained actual damages in excess of $75,000.00.

59. Defendants have acted with reckless disregard for the rights of Plaintiff and as such punitive damages in excess of $10,000.00 should be assessed against them.

60. Defendants should be ordered to reimburse Plaintiff a reasonable amount of attorney fees and costs incurred herein.

## COUNT III-42 U.S.C. § 1983 FIRST AMENDMENT/ INTERFERENCE WITH FAMILIAL RELATIONSHIP

Plaintiff restates the above: Additionally, Plaintiff alleges:

61.   Defendants intentionally interfered with Plaintiff's protected relationship and continue to do so.

62.   The First Amendment protects the fundamental right to intimate association, which includes the familial association between parents and children. Intimate associations "by their nature involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life." *Pi Lambda Phi Fraternity, Inc. v. University of Pittsburgh,* 229 F.3d 435, 442 (3d Cir. 2000) (*quoting Roberts v. United States Jaycees,* 468 U.S. 609, 619-20 (1984)). At issue in this case is Plaintiff's well recognized intimate familial association with his children.

63.   "Where a policy interferes with core associational liberties, `it cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests.' *Zablocki v. Redhail,* 434 U.S. 374, 388 (1978); *Doe v. Fayette County Children and Youth Servs.*, No. 8-823, 2010 WL 4854070, *18–19 (W.D. Pa. Nov. 22, 2010); *Behm v. Luzerne County Children and Youth*, 172 F.Supp.2d 575, 585 (M.D. Pa. 2001); *Roberts Jaycees*, 468 U.S. at 619 (1984).

64.   As a result of Defendants' conduct, Plaintiff has sustained actual

damages in excess of $75,000.00.65. Defendants have acted with reckless disregard for the rights of Plaintiff and as such punitive damages in excess of $10,000.00 should be assessed against them.

65. Defendants should be ordered to reimburse Plaintiff a reasonable amount of attorney fees and costs incurred herein.

### IV.   ABUSE OF PROCESS CLAIM

Plaintiff restates the above. Additionally, Plaintiff states:

66. Defendants abused the legal process by procuring a MCGJ subpoena, serving it solely to intimidate and harass Plaintiff.

67. Defendants used the process for an improper and ulterior or improper purpose.

68. As a result of Defendants' conduct, Plaintiff has sustained actual damages in excess of $75,000.00.

69. Defendants have acted with reckless disregard for the rights of Plaintiff and as such punitive damages in excess of $10,000.00 should be assessed against them.

### CONCLUSION

WHEREFORE, for all of the foregoing reasons, Plaintiffs respectfully requests an award of actual damages in excess of $75,000.00, an award of punitive damages in excess of $75,000.00, to the extent actual damages are not allowed or awarded, that nominal damages issue, reimbursement of attorney

fees, costs incurred in this matter and any other and further relief this Court deems proper.

S/Brendan M. McHugh
Brendan M. McHugh, OBA #18422
Dana Jim, OBA # 19495
Route 66 Attorneys, L.L.C.
P.O. BOX 1392
Claremore, OK 74018
(918) 608-0111
(918) 803-4910
emailbrendan@lawinok.com

**JURY TRIAL DEMANDED**

**ATTORNEY LIEN CLAIMED**